Good morning, may it please the court, Marcy Stepanski on behalf of the defendant's appellate from this case. Your Honor, if I may, I'd like to reserve five minutes for rebuttal. That would be fine, and you may proceed. Okay, thank you, Your Honor. This is a qualified immunity appeal, it's an interlocutory appeal, and it deals with three issues. The seizure of the dogs in this case, a due process claim, and a false arrest claim. All of the issues that are involved in this case are legal issues and are amenable to jurisdiction and appeal as a right. With respect to the seizure of the dogs, in this case, the warrant authorized the seizure of all animals in this case. And what's interesting is, although the plaintiff argues that the seizure of the dogs was improper, because the warrant, the affidavit for the warrant was false, the district court in this case at page nine of her opinion found that the affidavit was not false and the statements were true and there was sufficient probable cause to issue the warrant. With respect to the, the district court also held that even ignoring the challenge statements that the plaintiff had raised, there was sufficient probable cause regardless given the emaciated condition of the horses in this case. Now plaintiff argues that- I thought the district court said there was a genuine issue as to whether McDowell's affidavit was misleading. I believe at page nine of the opinion, the court held that the affidavit was true and that's why she dismissed the claims against premise upon the horses, the seizure of the horses. And the court even went- Didn't say it was misleading. Sometimes things can be true and misleading. Well, I think that the plaintiff argued that they were misleading, but I think the court held that they, that it wasn't. I think what the court also said, the district court in this case also said that even if you ignore the challenge statements, the, there was sufficient probable cause to seize the animals based upon the emaciated condition of the horses. Now with respect to the dogs, the plaintiff argues that there was food on the property. There were several outbuildings on the property and there was no food readily available or noticeable. That's demonstrated by the photographs that are a part of the record showing that the dogs were in small cages.  Any water that was on the property was frozen. And I think what is really important here too is that if there's food on the property, it doesn't do the animals any good if the caretaker's not feeding it to them. There was hay on the property, yet the horses were still emaciated. They were so thin that their hips and ribs were protruding. They were losing hair. One had a noticeably open wound. And they were so starved they were chewing bark off the trees. So when you have a situation like this, qualified immunity, it's objectively reasonable under these circumstances to seize all of the animals. Yeah, but I mean, we have to view the, all these facts and inferences in the light most favorable to your opponent. And I mean, I think these officers had been to the property before and there was this one big bin that had the dog food in it, right? And couldn't one infer that the officers knew that there was dog food in the one bin? Well, I think that would be speculative. I mean... But, you know, that's kind of what we do when we view the facts in this manner, right? We do, but we also view them from the perspective of the officer on the scene. And it's sort of akin to a child neglect case. You would not go in, a CPA worker would not go into a home and see one neglected child that was obviously neglected and three others that seemed okay, and only take the one child. You would take all of the children. I don't know. I mean, that sounds like a different, probably a difficult case. Depends. I mean, sometimes, you know. But I mean, the point is, it is true that these officers had been to the property before, correct? There had been similar problems with the property before. Yeah, so they had been there before, right? Right. And again, I mean, we have to sort of give all the inferences to your opponent, and one might infer that they knew that there was this bin of dog food there. Well, Your Honor, just as there was hay on the property too, if they're not feeding the food to the animals... Okay, but the fact that the dog isn't eating at the moment doesn't mean that the dogs weren't ever getting fed. You know? They weren't getting fed all the time, necessarily. That's true. But just as so that there was food for the horses, they were still emaciated. Right. The dogs weren't. I mean, you may totally prevail on all this in front of a jury, but, I mean, do you understand what I'm saying? That it's, there's only so much of this that we can buy into on this appeal. Well, Your Honor, I think that the other component, if we put aside the issue of whether a constitutional violation occurred, the other component is whether the law was clearly established with respect to the particularized facts in this case. Now, Plaintiff has not produced any case law suggesting that the officers were precluded, as a matter of law, based upon authority that was out there, that they could not seize the dogs under these circumstances, and, in fact, we submitted case law in our reply brief on neglected animals. It's proper to seize all of the animals. Well, you cite Brown. Pardon? You cite the Fifth Circuit case of Brown. We do, and a few others as well. Do you have others? Yes, there are others in our reply brief as well. I think there's McClendon and a few other of the cases, and they say that even if the other animals seemed fine, given the fact that there were some animals who were obviously neglected, it's proper to seize all of them. So given that type of authority that's out there, and you have an animal control officer on the scene, what is he to do? The objectively reasonable thing, especially with no clearly established law saying anything to the contrary, is to take all the animals. So it's our position that there was no constitutional violation based upon the authority of the warrant authorizing seizure of all animals, but that the law was not clearly established in any event. Well, I know you're probably not wanting to get to this point now, but so we also have here a state law claim for conversion, since we're talking about the animals having been seized. Yes. Shouldn't we remand that claim for further fact-finding in terms of whether the statute was followed, in terms of the way in which the animals were sold or placed for adoption? Adopted out, yes. With respect to the due process claim, the plaintiff has to prove that she had a property right on the animals in this case. And at the time the animals were adopted out, she was under an order of probation forbidding her to own, possess, control, reside with any animals. And in fact, she testified at a probation violation hearing under oath and under the penalty of perjury, that at the time these animals were adopted out, she had not owned, possessed, controlled, or resided with any, and hadn't even had contact with any animals. So it's our position that she should be judicially estopped from now claiming, when she testified in one proceeding, to avoid criminal sanctions and jail time, to turn around in this proceeding and say, I had an interest in the dogs, I have a due process property right. So there's no constitutional violation promised upon that, and it's also our position that there's no clearly established law that was presented by the plaintiff in this case, that Director Jandruski could not rely on that order of probation to adopt out the dogs. But it's not really clear whether, irrespective of the requirement of her probation, is it clear whether she owned the dogs or was simply letting them be, dogs and horses, be housed on this friend's property? And I know you're making an estoppel argument here. Right. But is the record clear in terms of? Well, the record is clear that she was forbidden to own them, and then, but there's an argument between her and Laubscher, whether she had the dogs, whether they were his dogs. He had testified at one point that they were his dogs, then he backtracked on that, said that they weren't. So there would, you know, the judge found that if you, if you delve into that quagmire that there might be a question of fact, but our position is that's not part of the calculus with respect to the Qualified Immunity Appeal. And then, with respect to the conversion claim that Your Honor mentioned, if the court declines jurisdiction over that state law claim, we would be comfortable having that remanded and perhaps dealt with in state court, because it would then be our position that the analysis with respect to due process would likely collateral stop an argument with respect to conversion. And the same arguments I'm making to this court would apply to that claim in state court. Lastly, I want to quickly address the false arrest claim. Plaintiff, Laubscher admittedly told Director Janzewski that plaintiff had given him a puppy while she was under an order of the probation forbidding her to have any contact with animals. Plaintiff tries to get around that by saying that Director Janzewski coerced Laubscher to make that statement. First of all, there's no constitutional violation in this case with respect to that claim, because the evidence that they proffered on that claim does not rise to the level of conversion as it, as it understood in terms of a constitutional violation. In fact, plaintiff on appeal barely argues that issue. But going beyond that, there's, the plaintiff presented no clearly established law that the acts attributed to Janzewski would constitute coercion so as to obviate probable cause in this case. Well, but coercion really isn't the issue. I mean, the issue is whether Janzewski knew that, that Laubscher was lying to him. Coercion's really just a false trail here. I mean, it boils down, did he, did he know that he was being lied to? I mean, he was inviting it in, in their theory, I guess. And the district court said a jury could so find. But there's no evidence to support that, your honor. You know, there's not much we can do for you in, in this interlocutory appeal, uh, with respect to the district court's judgment about whether a genuine issue exists as to a certain fact. I understand where you're coming from, your honor. Um, I would, I would suggest that with respect to, again, sidestepping the constitutional violation for a moment, clearly established, clearly established component of qualified immunity that they've presented no case law whatsoever to suggest that if a witness tells someone that this person did that and there's evidence in front of the officer seeing a puppy there and that officer knows that the plaintiff had given other animals to this person before, that he's required to know and not do anything about it. Okay. Um, so unless I see my time is up, I'll have your full rebuttal. Okay. Thank you, your honor. Thank you. Good morning, your honors. Nick Bostic on behalf of the appellee, Kimberly Schultz, if you please the court, I would like to, um, start out by addressing the issue with the validity of the warrant as it applies to the seizure of the dogs. The district court made that finding about officer McDowell's statement and she simply did not feel that it rose to the level of a falsehood. It really doesn't appear to me that she went any further in addressing it or giving any guidance as to how that impacted the horses. I'm sorry, the dogs, because she wasn't asked to. That was the problem in the district court. They argued the statute as the authority. So the district judge wasn't really asked to make a definitive finding for us on whether the warrant as to the horses, I'm sorry, I keep mixing them up, as to the dogs was false. That was in relationship to the horses. So there's a problem there created by the defendants, the appellants, in arguing one theory throughout discovery and at the district court level and now coming here and arguing that the warrant justified the seizure. So we really don't have a definitive issue ruling from the district judge as to that falsehood even though she made that finding. It's our position that that really applied to the analysis of the horses. And obviously I need to address jurisdiction. The position of the appellee is that especially as to the seizure of the dogs because they keep arguing standing and they keep arguing it from their point of view on the facts or the disputed facts and the false arrest and the disposition of the dogs, the district judge made adequate examples in her decision as to where she felt that these factual disputes needed to be resolved first. Obviously the review is de novo and if you disagree, you disagree. But it seemed to me that her decisions were rational. It seems to me that she is focusing not on extraneous facts but on core facts to the claims as to whether a constitutional violation occurred. Another interesting thing. Wasn't it McDowell and not Gretzky that submitted the warrant affidavit? Yes. Is there a case out there, is there something that you can point to that would, where you would have a warrant, where you have a warrant submitted by or undertaken by McDowell? I don't understand or I have not seen cases that would support using that against Gretzky. Gendrezky. There are a lot of pronunciations of his name. It's a hard case in that regard. How do you pronounce it? My client pronounces it Gender Gretzky. Gender Gretzky. Okay. I don't know how she gets that. I don't either. They have the longest history so we'll go with Gender Gretzky. And you see the question. Yes. There's a distinction here. If he did not issue it and, I mean, doesn't he have a defense for the execution of a warrant in which he did not do anything improper in the creation of? And I asked him at his deposition whether he reviewed that affidavit in his capacity as the boss, the supervisor of Mr. McDowell. And his answer was, I don't recall. But my point would be he made, and this was something that I think Judge Cole brought up, he made several trips out there. He knew more about this relationship and he had that history with Ms. Schultz for a long time. And then he goes back and he helps with the gathering of the dogs, the gathering of the horses, loading them up. So he participates in the execution of the warrant. I understand your point and we have, it's very thin, but my point is, and again, I understand under 1983, just because he's the supervisor does not give him liability. I fully appreciate that. But his participation in going out there with Mr. McDowell, making the initial observations, going back to execute the search warrant, plus his long history with Ms. Schultz, I think is enough to get us to the jury. Now, again, whether that carries the day or not, I think that that participation is enough of his self-involvement. Even if someone else submitted the affidavit and the warrant was issued based on someone else's affidavit? Yes. So any officer who executes an appropriately obtained warrant who has prior history with that? No. Just the execution. He has to participate more somewhere in the development of it. And I can't give you the site. I think it's actually in my, and that's not in this brief. But it was a case that I had in this very, in this court, none of you were on the panel, but it's Wheeler versus the City of Lansing. And I think that decision came out in 2011. In that case, we had two officers from two different jurisdictions. The junior officer in the jurisdiction where the search occurred was the affiant. But the officer in the other jurisdiction was more experienced, and he brought most of the information to the affiant. And the two of them went together and sat down with the prosecutor when the warrant was issued. And he had a lot of information about the specificity that should have been in the warrant for the particularization requirement that he didn't disclose. So my question, Mr. Bostic, is to overcome qualified immunity as a defense, doesn't there have to be a showing on your part that the officers, McDowell in particular, but maybe Gender Rescue as well, had a, demonstrated a deliberate falsehood or showed reckless disregard for the truth in terms of providing information in support of the search warrant? And that any omitted or false information was material to the determination of probable cause? And I don't know if that is a requirement. Is there anything in the record that would show that sort of deliberate indifference intent to commit fraud, reckless disregard for the truth? As to Gender Gretzky, nothing other than what I've already said. And as to McDowell? As to McDowell, we have some huge and very material omissions. In Mr. Lobster's deposition, he specified all of the things that he told him while he was there before he went and got the warrant. He told him about the bins of dog food. He told him about the other things that were in the barn. There was some sort of, or the shed, I mean, there was some sort of, I forget what they call them, some sort of treats for the horses. There was hay, there was a delivery of hay on the way. And he specifically told them, I've already gone in and taken care of the dogs and I'm coming out now to take care of the horses. And they were there in the morning. And I can't appeal Judge Roberts' decision, or her finding, obviously, under these circumstances. But when you think about all of those huge omissions, and again, Your Honor, we weren't arguing the warrant as the justification for seizure of the dogs in front of Judge Roberts. We were arguing the statute. So, but I think those material omissions create the falsehood necessary to get me to that finding that you're asking about. Did, did, did Jinderesky, did he not make a call to report a problem with the horses? Is that, you know, I know the record goes back and forth. There was an anonymous call, there was someone who clearly called, but I thought the testimony in the record was that he actually, I'm sorry, not Jinderesky, what, I'm sorry?  Laubscher. Thank you. Sorry. That he actually made a call. Right. Is that not in the record? Is that, am I incorrect? No, it's in Mr. Laubscher's deposition, and I believe Ginder Gretzky eventually admitted it during his deposition that Laubscher was the caller. So that's true, Your Honor. So, I mean, I'm just struggling with you saying that Laubscher is saying there's all this food here, I'm doing all this, I'm taking care of them, then why two days earlier or one day earlier did he make a call and say that there were abused animals at this location? And if you, and I believe I cited this in my brief, but Mr. Laubscher denied that during that alleged anonymous call, he mentioned the condition of the animals. What he was referring to was the pens for the horses and the fact that they didn't have a cover, a shelter for them to stand under in the wintertime. Mr. Laubscher, I'm positive it's in there, and hopefully I cited it in my brief, the page site, but Mr. Laubscher said, denied, that during that anonymous call, he complained about the health or vitality of the animals. So he is the one that called that morning. So, Ginder Gretzky's claim- So he called to report that there's a problem with animals, and they- Ginder Gretzky says that the caller complained about the health and the condition and the vitality of the animals. Mr. Laubscher denies that that topic was part of the call. But he doesn't deny calling and hindering a complaint. He admitted calling, and he only admitted that a portion of his complaint addressed the lack of a cover, of a shelter for them to stand under. There's no doubt that Ginder Gretzky and McDowell did go out to the property, did have first-hand observations of the horses. That morning. That morning. And I believe Mr. Ginder Gretzky said that his last previous visit was about two months earlier, and then there were some in the fall of the previous year, 2008. And I must disagree with my counsel opponent here about they had been out there multiple times for problems. Those other trips were because my client had asked them to come out and work with her in getting a kennel license established. So those visits were to determine the necessities for a kennel license for all the dogs. Can you address the false arrest claim? I'm struggling with a false arrest claim against an officer who didn't arrest the plaintiff and didn't make the sworn statement to obtain the affidavit. How can Ginder Gretzky be guilty of false arrest if he didn't make the arrest? He knew that there was no puppy there in the summer of 2009. And he essentially threatened Barry to say that. And then he also pressured Barry's sister, Ms. Crane, and threatened her. But I would ask you to bear in mind the relationship that Mr. Ginder Gretzky had fostered and cultivated over those three months with Mr. Laubscher. Yeah, but I'm asking about the actual cause of action for false arrest. If you're going to accuse someone of false arrest, don't they have to have participated in, don't they have to have sworn out the affidavit or actually made the arrest in order to be guilty of false arrest? I don't want to say the case name off the top of my head. I might get it wrong. But I believe it's a case out of the circuit. If you cause the arrest, it doesn't have to be causing it by sworn affidavit or under oath. The case law is if you cause the arrest. He admitted during his deposition that he sent the report that she had been in contact with an animal to her probation officer in the other county knowing that that would cause a warrant to be issued for her arrest because she had only served the jail time in April and was done. And he now had to do something to take care of, you know, essentially to cover himself for getting rid of her animals. The probation officer testified at the probation hearing that the only information she had that caused her to generate the pickup order was the report from Mr. Gendogretzky. So it's our position that there's multiple ways to cause an arrest. And that's one of them. And he knew it was false when he made it. And he essentially created it. Well, and along with that same thought, I don't really know how to plug it in here. But Gendogretzky, as you may recall, Mr. Lobsher actually testified to this. He befriended Mr. Lobsher and then about the same time he sent that report in, he took Mr. Lobsher to his probation officer to be arrested on the warrant that Gendogretzky had caused to happen in Clare County. So the timing was such that he ended up having them both in jail at almost the same time, one on a probation violation and the other on the warrant that he generated. One last comment, and that is this estoppel issue.  She was out of jail. She was at the probation violation. And she had said there's no issue with my animals because they've all been given away. So her statement was false. The defendants in this case actually said at the criminal proceedings they were her animals. So they are stopped from now saying they're not. Thank you. Thank you, Mr. Bostic. Ms. Stepatsky. Thank you, Your Honor. Just to address Judge Ketledge's question, on page nine of the district court opinion, the judge says she cites the arguments that plaintiff made with respect to the affidavit, no food or water available for any of the animals on the property, whether McDowell had extensive training in all aspects of animal control, and one horse was in the worst condition a horse can be in. That's level one in terms of the emaciation. And the court held plaintiff has not met her burden. Jandrowski's and McDowell's statement are not false. And I don't know how those statements can be true as to the horses, but not true as to the dogs. With respect to the statute and the argument about the reliability or the validity of the warrant, that argument was raised in the motion for summary disposition. It was raised in the section preceding the argument as to the dogs. I think trial counsel just didn't think he had to repeat it. What he did was he argued additional arguments with respect to the dog. And I want to address a red herring with the statute. The statute requires seizure of all animals when an arrest is made. However, it does not preclude seizure of all animals if an arrest is not made. It's mandatory to seize all, but it doesn't forbid the officers from not seizing animals just because an arrest is not made at that moment. So that does nothing to preclude the seizure of the dogs in this case. Again, there's no clearly established law precluding the seizure of all of the animals in this case given the emaciated condition of the horses. And in fact, we presented case law suggesting that that's the reasonable and proper thing to do. So it's our position that qualified immunity should apply to the defendants in this case with respect to the seizure of the dogs. The horses were not starved in one day. There can't be an argument that, I just hadn't gotten to him today. This was a long pattern of abuse and neglect. With respect to the false arrest claim, there was a puppy. I don't think there's any dispute that there was a puppy, that Lobsher gave Jandruski a puppy. What Lobsher says when he's questioned about this coercion or the accusation that Jandruski knew he was lying is, well, I told him what I thought he wanted to hear. There's no evidence that Jandruski told him to lie. There's no evidence that Jandruski knew he was lying. That's just Lobsher's suggestion. The other things that Lobsher or plaintiff relies on with respect to Lobsher was that Jandruski told Lobsher he could be responsible too. And that's true. Under the statute, it's not just an owner who can be responsible, a caretaker who neglects animals can be criminally responsible as well. So there's nothing wrong with Jandruski telling that to Lobsher. It's a tongue twister. And then the other thing that plaintiff relies on is that Jandruski appeared at her probation violation hearing and appeared angry. He was red in the face and was sitting in his truck and shaking. Well, she had already been charged and arrested on the probation violation, so nothing that occurred that day with respect to Jandruski's behavior and Lobsher's alleged intimidation could have caused the arrest. This is something that occurred after, so it just doesn't make sense in terms of the timing. Lastly, with respect to judicial estoppel, the timing on the order is important because Jandruski knew that That's why, at that point, he felt it was proper to adopt out the animals. There should be qualified immunity for that. There's no clearly established case left suggesting the contrary. Plaintiff, in their brief, relied on this Minch case and the difference in Minch is that the defendant there had owned or possessed the firearms lawfully. And in this case, plaintiff testified at her probation violation hearing that back at the time of the adoption, she had no interest in these animals. And why it estops the plaintiff and not the defendants in this case, is when you look at the elements of judicial estoppel as briefed in our brief, you'll see that the person that's being estopped has had to have convinced the court in the prior case of their position, and she did. The probation violation charge was dismissed and she didn't go to jail. Those elements are met and she should be judicially stopped from doing a 180 now and claiming an interest in the animals to have a financial windfall when she testified under oath before that she had no interest to avoid criminal time. Unless the court has any questions, I'll rest on my brief and I'll thank you and request the court to reverse the denial of summary judgment on qualified immunity. Okay, thank you, Counsel. Mr. Bostick and Ms. Stepensky for your arguments today.